**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
                                                          :

**UNITED STATES OF AMERICA**          :

                                                  :

         **v.**                           :      **08-CR-1213 (JFK)**

                                                    :

**JAMAL YOUSEF,**                    :

                                                  :

                       **Defendant.**        :
------------------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF**
**JAMAL YOUSEF TO DISMISS THE INDICTMENT**

Melinda Sarafa
SARAFA LAW LLC
80 Pine Street, Floor 33
New York, NY 10005
Tel: 212-785-7575
Fax: 212-785-7577

*Counsel to Defendant Jamal Yousef*

## PRELIMINARY STATEMENT

This reply memorandum of law is respectfully submitted in further support of Jamal Yousef's motion to dismiss the indictment pursuant to the Due Process Clause of the Fifth Amendment.

## DISCUSSION

Mr. Yousef has moved to dismiss the indictment on the ground that there is no nexus between him and the United States sufficient to justify extraterritorial application of the narco-terrorism statute to him. Faced with an unprecedented disconnect between a criminal defendant and the United States, the Government urges this Court to stretch the boundaries of due process based upon the most attenuated of theories, constructed from supposition and, in some instances, misrepresentation of the evidence. Mr. Yousef respectfully submits that this Court should decline to do so.

The undisputed facts establish that Mr. Yousef is a foreign national whose alleged conduct took place entirely outside the territory of the United States. The alleged offense consists of a conspiracy to sell weapons located in Mexico to a foreign organization that would take delivery outside the United States, possibly in Panama, in exchange for cocaine to be delivered to the coast of Honduras.  There is no evidence to suggest that the cocaine was to be shipped to, from or through the United States. At no time were any representations made to Mr. Yousef or his co-conspirators that the weapons were intended for use against the United States or United States nationals. Nor were any representations made to Mr. Yousef or his co-conspirators that the organization purportedly involved, the FARC, historically directed or currently directs violent acts against the United States or United States nationals. In sum, the Government is unable to point to any evidence that even suggests that Mr. Yousef could reasonably expect that his alleged

conduct would affect the United States or its citizens.

Neither the seriousness of the charges in this case nor the defendant's personal background strips Mr. Yousef of the constitutional protections essential to the fair administration of justice in this country. The Due Process Clause of the Fifth Amendment applies equally to all who are subjected to the enormous power of the federal criminal justice system, without regard to the nature of the allegations, and that protection requires that there be a nexus between a defendant and the United States sufficient to ensure that extraterritorial application of a criminal statute is not arbitrary or fundamentally unfair. *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003).

In this case, in a strained effort to document some link between Mr. Yousef and the United States, the Government makes the following three claims:

(1)  "Yousef and his co-conspirators knew and understood that the transaction would benefit a narco-terrorist organization which has targeted, and has been well known to target, United States interests in Colombia and elsewhere."

(2)  "[I]it was made explicitly clear in the negotiations that the organization purchasing the weapons – the FARC – trafficked large quantities of narcotics to the U.S."

(3)  "[A]ccording to Yousef and his co-conspirators themselves, the weapons offered for sale were American weapons stolen from American armed forces in Iraq."

Gov. Br. at 1. These claims lack grounding in the evidence, and ultimately fail to establish a nexus between Mr. Yousef and the United States sufficient to comport with due process. Each will be addressed in turn.

**The FARC's Alleged Targeting of United States Interests**

The Government asserts, in a very carefully-worded statement, that "Yousef and his co-conspirators knew and understood that the transaction would benefit a narco-terrorist

2

organization which has targeted, and has been well known to target, United States interests in Colombia and elsewhere." Gov. Br. at 1. This assertion is deliberately structured to imply, without expressly stating, that Mr. Yousef knew that the FARC is a narco-terrorist organization that has targeted United States interests. The statement combines three separate allegations: (1) the alleged weapons sale was to benefit the FARC; (2) the FARC is a narco-terrorist organization; and (3) the FARC has targeted United States interests in Colombia and elsewhere. The Government is able to cite evidence establishing that Mr. Yousef had knowledge of the first allegation, *see* Gov. Br. at 3 & 10, but not the second or third.

The Government attempts to make much of CS-1's statement that his organization is "about an armed struggle to try to get what we want in our country" (a statement that could have come from the mouth of any of the Founding Fathers who gave us the Due Process Clause), Brown Decl. Ex. A at 19, and of CC-1's statement that he is aware of the "subversive movements in Colombia," Brown Decl. Ex. A. at 36. *See* Gov. Br. at 3. But these broad statements, whether viewed individually or in combination, in no way suggest that the FARC targets United States interests or that CC-1 is aware of any such targeting. They were made, moreover, during a conversation that did not even involve Mr. Yousef. The Government simply cannot point to any evidence suggesting that Mr. Yousef had any knowledge of the FARC's activities generally or of its specific targeting of United States interests.[1]

---

[1] The Government contends that Mr. Yousef is liable for "the acts and statements of his co-conspirators." Gov. Br. at 10-11. While this may be an accurate statement in the context of conspiracy law, the Government tellingly cites no authority for the proposition that co-conspirator liability has any appropriate place in a due process analysis of the extraterritorial application of a federal statute to a particular individual. In any event, with respect to the FARC's supposed targeting of United States interests, the Government cites no evidence establishing that either Mr. Yousef or his co-conspirators had such knowledge.

**The FARC's Alleged Trafficking of Drugs to the U.S.**

According to the Government, "it was made explicitly clear in the negotiations that the organization purchasing the weapons – the FARC – trafficked large quantities of narcotics to the U.S." Gov. Br. at 1. This statement is not supported by the evidence. More importantly, without evidence that Mr. Yousef was aware that the FARC trafficked narcotics to the United States, this statement fails to establish any meaningful nexus between Mr. Yousef and the United States for purposes of the due process analysis required here.

In support of its claim that it was made "explicitly clear" during negotiations that the FARC "trafficked large quantities of narcotics to the U.S.," the Government relies upon two excerpts from conversations that did not involved Mr. Yousef. *See* Gov. Br. at 4. Viewed in proper context, what becomes clear is that no such representation was made explicit during the negotiations, and certainly not to Mr. Yousef.

First, the Government cites the following excerpt from the statements of CS-1 to CC-1:

It would be good to have the infrastructure to be able to go and set ourselves up on the highways and avenues of the United States. But we don't have that kind of infrastructure. [. . . ] So, we have to depend on the infrastructure that several organizations in Mexico have.

Gov. Br. at 4 fn.8 (quoting Brown Decl. Ex. D at 83-84). In fact, contrary to the Government's claim that the FARC's "avowed principal cocaine market is the United States," Gov. Br. at 8, CS-1 stated *three times* during the referenced conversation that the FARC's largest market is Mexico. The conversation proceeded as follows:

CS-1:  Our largest market right now is Mexico.

CC-1:  Uh-huh.

CS-1:  Unfortunately. But it is what it is. Our largest market right now is Mexico. You guys, from here down, and . . . and Guatemala, Honduras, Costa Rica [U/I], are simply bridges.

4

CC-1:   Uh-huh.

CS-1:   But our market is . . . is Mexico. Because we don't have the . . . [U/I] . . . It wou . . . It would be good to have the infrastructure to be able to go and set ourselves up on the highways and avenues of the United States.

        //[U/I]

CS-1:   But we don't have that kind of infrastructure.

CC-1:   Yes.

CS-1:   So, we have to depend on the infrastructure that several organizations in Mexico have. Non [sic] in particular. We are not married to any . . . I want you to know that. Unfortunately, we've become – and it pains me even more to say this – like whores. We're delivering to the highest bidder.

CC-1:   Uh-huh.

CS-1:   That's what we're doing. But our infrast . . . It's sad but true. We are making deliveries to several organizations in Mexico.

Brown Decl. Ex. D at 83-85.

When the conversation is viewed in context, it is clear that the Government does not in fact have support for its claim that the FARC's "representatives have explicitly informed the defendant and his co-conspirators [that it] finances its operations by trafficking large amounts of cocaine to the United States." Gov. Br. at 7-8. In reality, a single purported representative of the FARC told one co-conspirator, not Mr. Yousef, that the FARC sends large amounts of cocaine to *Mexico*, and can only hope to send narcotics to the United States.

Second, in a remarkable reach to support its claim that the FARC representatives made it "explicitly clear" that the FARC trafficked large quantities of cocaine to the United States, the Government states that "CS-1 explained to CC-2 that a kilogram of cocaine has a different value depending on where it is delivered and sold; and used Miami and New York – two cities in the United States – to illustrate his point." Gov. Br. at 4. What the Government fails to note is that

5

before getting to Miami and New York, CS-1 cited a host of locations in Central and South America to illustrate his point. As CS-1 actually put it:

> One thing is a kilo of drugs . . . One thing is a kilo in the jungles of Colombia. Another thing is a kilo on the coast of Colombia. Once it's in the ocean, in . . . uh, in international waters . . . One thing is a kilo placed on the coast of Honduras, another thing is a kilo in Mexico City.  And another thing is a kilo in Miami or New York. You understand what I'm saying?

Brown Decl. Ex. C at 101. This bit of conversation does not suggest that the FARC is trafficking large quantities of narcotics to the United States; rather, it expresses nothing more than the understanding of CS-1 that a kilo of drugs has different value in different locations.

Most importantly, the Government cites no evidence that Mr. Yousef was aware that the FARC distributes drugs to the United States. The Government also ignores the fact that the drugs supposedly at the center of the negotiations in this case were *not* destined for the United States, nor were they coming from or through the United States. Accordingly, it does not further the Government's position to cite narcotics cases in which courts have found due process satisfied where extraterritorial conduct is undertaken with knowledge that narcotics were destined for the United States or that the plan for shipping drugs would likely have effects in the United States. *See* Gov. Br. at 8-9 (citing *United States v. Muhammad-Omar*, 323 Fed. Appx. 259, 261 (4th Cir. 2009) (no due process violation where defendant had reason to believe that drug trafficking negotiated abroad involved drugs destined for the United States); *United States v. Khan*, 35 F.3d 426, 429-30 (9th Cir. 1994) (due process satisfied as to crew members of a foreign-flag vessel where the purpose of the smuggling operation was to bring drugs into the United States)).

**<u>Purported Provenance of the Weapons</u>**

Finally, the Government contends that, "according to Yousef and his co-conspirators themselves, the weapons offered for sale were American weapons stolen from American armed

6

forces in Iraq." Gov. Br. at 1. The Government repeatedly indicates that the weapons, or at least some of them, were stolen from the United States military in Iraq, Gov. Br. at 1, 3, 7, 8, 9, 12, but such statements do not accurately reflect the evidence. The actual conversations concerning the purported provenance of the weapons establish no more than that one co-conspirator claimed that the weapons were the type used by the "gringos" in Iraq, and were stolen and purchased from Iraq. These representations alone do not succeed in establishing a nexus between Mr. Yousef and the United States sufficient to satisfy due process.

The representations concerning the provenance of the weapons were made by CC-1 in his initial sales pitch to CS-1. CC-1 stated that the weapons "come from Iraq." Brown Decl. Ex. A at 24. He went on to state: "They're totally new and it's the latest generation, what the 'gringos' are using in Iraq. How did we obtain them? [From the 'gringos' themselves?]" *Id.* At a later point in the conversation, CC-1 stated: "I'll explain that as far as the American weapons are concerned, those were brought over from Iraq. They were stolen and purchased in Iraq." *Id.* at 27.

First, there is nothing in these statements indicating that the weapons were obtained from the United States military. CC-1 boasted about the weapons being "totally new" and of the type that the "gringos" are using in Iraq. He then apparently went on to ask two rhetorical questions: "How did we obtain them? [From the 'gringos' themselves?]" These questions were not answered by CC-1 or anyone else. Thus it remains unclear exactly where in Iraq the weapons were supposedly procured from. The subsequent reference to the "American weapons" does not settle the matter, as it is not clear whether the adjective "American" refers to the fact that they are the type used by Americans, the location of manufacture, or the prior owner. The fact that the weapons are represented to be "totally new," moreover, suggest that they were not stolen from United States troops, as such weapons could hardly be expected to be unused.

7

Second, the representations concerning the weapons come not from Mr. Yousef, as the Government claims, but from an alleged co-conspirator who is trying to establish his own credibility and make a sale to an unknown buyer. On the heels of the rhetorical questions, CC-1 told CS-1 to ask whatever he wants, "because that's what we brought you here for, so that you can gain trust and say, 'Well, these guys are no charlatans.'" Brown Decl. Ex. A at 24. Viewed in their proper context, the representations hardly establish, as the Government contends, that Mr. Yousef himself claimed that the weapons were stolen United States military property.

Third, and critically, no actual weapons were ever produced in this case. Not only is it questionable whether Mr. Yousef in fact owned any weapons stored with a relative in Mexico, but even if he did, their true provenance remains unknown.

Fourth, the purported provenance of the weapons concerns events in the past that have no bearing on the intended effects of the transaction under negotiation. Mr. Yousef is not charged with having stolen the weapons or even with possessing stolen United States property; the Government cannot substantiate any such allegations. He is charged instead with conspiring to sell weapons to the FARC in exchange for narcotics, but there is nothing the Government can cite to indicate that Mr. Yousef had any reasonable expectation that the proposed transaction would have effects in the United States or on United States nationals.

**Lack of a Nexus Sufficient to Satisfy Due Process**

This case presents a situation dramatically different from that of each and every case in which a court found a nexus between the defendant and the United States sufficient to satisfy due process. In *Yousef*, the defendants conspired to attack United States-flag aircraft and actually bombed a foreign-flag aircraft as a test run in furtherance of the conspiracy. 327 F.3d at 112. In *United States v. Al-Kassar*, 582 F.Supp.2d 488, 494 (S.D.N.Y. 2008), the defendants allegedly

8

conspired to sell weapons to the FARC with the express expectation that such weapons would be used to kill United States nationals. In *United States v. Davis*, 905 F.2d 245, 249 (9th Cir. 1990), the defendants intended to transport drugs into United States territory. *See also United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257-59 (9th Cir. 1998) (same); *United States v. Khan*, 35 F.3d 426, 429-30 (9th Cir. 1994) (same). In *United States v. Reumayr*, 530 F.Supp.2d 1210, 1223 (4th Cir. 2008), the defendant allegedly conspired to blow up the Trans-Alaska pipeline, and reached out into the United States several times via email during the planning stages of the attack. In contrast, Mr. Yousef is alleged to have conspired to sell weapons to the FARC, with no expectation whatsoever that they would be used in a manner that would affect United States interests.

The Government, apparently conceding that the facts here fall far short of those in the cited cases, contends that those cases did not set a due process threshold. But in urging the Court to find a sufficient nexus on the facts presented here, the Government advocates for virtual eradication of the due process protection. In essence, a finding that due process is satisfied here would permit the United States to prosecute a Russian national who sold a United States-made machine gun to a Chinese national of Uighur descent in Moscow, with the expectation that the weapon would be used in Xinjiang. Extraterritorial application of United States law under such circumstances defies rationality; it would be arbitrary and fundamentally unfair. Such is the case here, and the indictment against Mr. Yousef should be dismissed.[2]

_____

[2] The Government contends in a footnote that "jurisdiction" in this case is consistent with four of the five international law principles. Gov. Br. at 10 n.10. It bears emphasis that Mr. Yousef's motion raises a Fifth Amendment due process challenge to the extraterritorial application of the narco-terrorism statute, not an issue of subject matter jurisdiction. (Mr. Yousef does not, however, concede that there is subject matter jurisdiction in this case, and expressly reserves any such challenge.) As noted in Mr. Yousef's opening brief, the Second Circuit has not addressed whether principles of international law may guide the inquiry into whether the due process nexus

**CONCLUSION**

For the foregoing reasons, Mr. Yousef respectfully submits that application of the narco-terrorism statute to Mr. Yousef would be arbitrary and fundamentally unfair, in violation of the Due Process Clause of the Fifth Amendment, and respectfully urges this Court to grant his motion to dismiss the indictment.

Dated: July 26, 2010
       New York, NY

Respectfully submitted,

s/Melinda Sarafa
Melinda Sarafa
SARAFA LAW LLC
80 Pine Street, Floor 33
New York, NY 10005
Tel: 212-785-7575
Fax: 212-785-7577

*Counsel to Defendant Jamal Yousef*

---

requirement is satisfied in a particular case. *See* Def. Br. at 6 n.4. However, even if this Court were to consider principles of international law as a "rough guide" to assist in the due process inquiry, Mr. Yousef submits that they do not support extraterritorial application of the narco-terrrorism statute in this case.